

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00235-CV

_____

IN THE INTEREST OF Y.J., A CHILD

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-107644-18

Before Sudderth, C.J.; Gabriel and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell
Chief Justice Sudderth and Justice Gabriel concur without opinion.

## MEMORANDUM OPINION

This unusual appeal is from an order terminating parental rights, but neither parent has appealed, the Department of Family and Protective Services (Department) was dismissed and has not appealed, and no appealing party challenges the termination. Instead, three intervenors—the Navajo Nation, the Office of the Attorney General of the State of Texas (AG), and two of the nonparents the trial court named as joint managing conservators for the child, C.B. and J.B. (the Bs)—appeal the part of the trial court's order naming the Bs and the child's Navajo maternal great-aunt A.J. the child's joint managing conservators.

At trial and on appeal, the majority of the parties' arguments have centered on the constitutionality of the federal Indian Child Welfare Act (ICWA) and its applicability to this case. If constitutional, ICWA applies to certain aspects of this case because the child at issue is Navajo through her biological mother (Mother). *See* 25 U.S.C.A. §§ 1901–63. At the heart of the dispute is whether ICWA's post-termination placement preferences—which favor placement of an Indian child with Indian families—control, or whether the trial court should apply solely Texas law regarding the child's best interest. *Id.* § 1915 (mandating that Indian child be placed in a preadoptive or adoptive placement with Indian relatives, the child's tribe, or any other Indian family absent good cause not to do so); Tex. Fam. Code Ann. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

The Navajo Nation contends that ICWA is constitutional and mandates placing the child solely with A.J.[1] The AG and the Bs claim that ICWA is unconstitutional under both the United States and Texas Constitutions, that it does not pre-empt Texas law and therefore cannot be applied to these proceedings, and that the trial court abused its discretion under Texas law by naming A.J. as one of the child's joint managing conservators along with the Bs.

The trial judge purported not to determine ICWA's constitutionality under the United States Constitution. Instead, he held that even if ICWA does not violate the United States Constitution, it nevertheless does not apply to this proceeding because (1) ICWA violates the anticommandeering doctrine and therefore cannot validly pre-empt Texas law and (2) Family Code Section 152.104, which the judge concluded attempts to engraft ICWA into Texas law, violates the Texas constitution.

After considering the record and procedural posture of this case—taking into account the ultra-accelerated nature of this appeal—we conclude we need not decide at this time whether ICWA is constitutional; regardless of ICWA's application, the trial court committed reversible error requiring a new trial on conservatorship. We therefore reverse only the part of the trial court's order naming the Bs and A.J. joint managing conservators for the child, and we remand the case for a new trial on that issue.

---

[1]Alternatively, the Navajo Nation argues that if ICWA does not apply, the trial court did not abuse its discretion by naming A.J. a joint managing conservator along with the Bs.

## Pretrial Factual and Procedural Background

### Removal and initial placement efforts

On June 13, 2018, the Department filed a petition seeking conservatorship of Y.J. or termination of her parents' rights because Y.J. had tested positive for marijuana, amphetamines, and methamphetamines at birth. In the attached affidavit, a Department caseworker averred that Mother had told Texas Child Protective Services (CPS) workers that she is a member of the Navajo tribe and that the workers had contacted the tribe to seek Navajo tribal members for foster placement. Mother named more than one man as a possible father; at least one of those men requested DNA testing and was excluded as Y.J.'s biological father. The Department alleged that it had attempted to contact some of Mother's suggested placements, but none were suitable. It also alleged that Mother had an extensive history with New Mexico CPS, that seven of her other children had been removed from her care, and that "the Tribal Council" had placed four of those children with relatives. The caseworker stated further in the affidavit that one of Mother's other children had been removed in Texas when the maternal grandmother—who allegedly had a New Mexico CPS history and with whom Mother had left the child—had tested positive for methamphetamine use. The affidavit also stated that the Navajo Nation was "working to locate a potential Navajo foster home for placement."

An associate judge signed an order naming the Department Y.J.'s temporary sole managing conservator.

4

Mother waived service of citation. After the statutory temporary adversary hearing, *see* Tex. Fam. Code Ann. § 262.201, the trial court ordered Mother and the child's alleged fathers to submit the Section 261.307[2] Child Placement Resources Form and specifically found, "the Department . . . does not have the option of placing the child with a relative [or] other designated caregiver." The order also noted that the "inquiry regarding the child or family's possible Indian ancestry [was] not complete due to ex parte proceedings or similar circumstances." The Department placed Y.J. in a non-Indian foster home.

Four days after the adversary hearing, the Navajo Nation sent a letter stating that Y.J. was eligible for "ICWA[] service" and that the Navajo Nation would assign an ICWA social worker to the case to coordinate services with the Department.

**Identification of first ICWA-compliant home**

Although a caseworker noted in the child's June 2018 service plan, "Worker will engage with the Navajo Nation to discuss possible placements," she also stated that the Navajo Nation had not contacted the Department about what it could do to preserve the child's heritage. In a July 2018 status report, a CPS specialist told the trial court that the Navajo Nation had identified an ICWA-compliant home as a possible placement.

---

[2]*See* Tex. Fam. Code Ann. § 261.307(a)(2) (describing form's contents, including instruction that parent list at least three persons who could be relative caregivers or designated caregivers), § 264.751 (defining types of caregivers).

Around the same time, the Department filed a Motion for Expedited Placement Under the Interstate Compact for the Placement of Children (ICPC),[3] in which it sought an expedited placement of the child with a Colorado family identified by the Navajo Nation. The Navajo Nation had also sent the Department a "favorable Navajo Adoption Home Study" on the family. The nine-page, detailed report discusses the suitability of the couple and the man's Navajo heritage and family ties. It further notes that although the man had a "finding" on an Arizona background check, the offense was over twenty years old (i.e., when he was twenty-one or younger) and his lifestyle had changed for the better.

The trial court approved the placement in late July 2018 and ordered the Department to expedite its compliance with the ICPC to effectuate the placement. But the Department's attempts to comply with the ICPC for this placement were repeatedly rejected for administrative reasons, such as missing records and lack of a social security number for Y.J. After a second failed attempt in October 2018, the Department stopped trying to comply with the trial court's order because, by that time, a Texas federal judge had held ICWA unconstitutional in a case in which the State of Texas is a party. *See Brackeen v. Zinke*, 338 F. Supp. 3d 514, 536–46 (N.D. Tex.

---

[3]*See id.* §§ 162.101–.107 (adopting the ICPC, by which states cooperate to place children across state lines with the goal of placing children "in a suitable environment and with persons or institutions having appropriate qualifications and facilities" while giving authorities in the state where the child resides and the state where the child is to be placed an adequate opportunity and the necessary information to evaluate the placement's suitability).

2018), *rev'd*, 937 F.3d 406 (5th Cir. 2019), *reh'g en banc granted*, 942 F.3d 287 (5th Cir. 2019). The Department never placed Y.J. with the Colorado family,[4] and she stayed with her Texas, non-ICWA-compliant foster placement.

**Interventions related to Y.J.'s placement**

In late November 2018, the Navajo Nation intervened in the Department's suit and immediately sought removal of the case to a tribal court under ICWA. The Bs, who by that time had adopted Y.J.'s three-year-old half sibling Alan,[5] also intervened seeking termination of Y.J.'s parents' rights, adoption of Y.J., and appointment as Y.J.'s permanent managing conservators. The Bs, along with Mother,[6] opposed removal of the case to a tribal court. The Navajo Nation opposed placement of Y.J. with the Bs.

After the Bs intervened, Mother signed an affidavit that was filed in the clerk's record; the affidavit contains a certificate of service from Mother's appointed counsel. In the affidavit, Mother asked the trial court to place Y.J. with the Bs "as soon as possible . . . [to] allow her to be placed with her sibling (who is also a Navajo

---

[4]The Department began reconsidering this family in January 2019, and they were approved in February 2019, but by that time the Navajo Nation had notified the Department about A.J., who as a family member is a preferred placement under ICWA.

[5]Alan is a pseudonym. *See* Tex. Fam. Code Ann. § 109.002(d). Mother has seven other children, but Alan is the closest in age to Y.J. Because Y.J.'s father is unknown, we refer to all of Mother's other children as half siblings.

[6]The Department had lost track of Mother, but the Bs found her in the Tarrant County Jail. Mother's appointed counsel filed the objection to removal to tribal court.

member).” Mother averred that placement with the Bs allowed Y.J. “reasonable proximity to [Mother], her home, [and] extended family and siblings.” Mother also signed a Section 261.307 form naming the Bs as “relatives or <u>close family friends</u>” who could take care of Y.J.

On December 3, 2018, the Fifth Circuit Court of Appeals stayed enforcement of the Northern District trial judge’s order determining that ICWA is unconstitutional.

Later that month, the Navajo Nation filed a Motion for Placement of the Child, urging the trial court to place Y.J. with the Colorado family that the Navajo Nation had originally identified and complaining that the Department had not complied with the July 2018 order requiring it to do so. The Bs responded by moving to have Y.J. placed with them. They also opposed the Navajo Nation’s motion, arguing that if ICWA does not apply, Texas law favors placement with them because they had adopted Alan. *Cf.* 40 Tex. Admin. Code § 700.1309(3) (setting forth factors Department considers in placing children in substitute care and including as a factor that “[s]iblings removed from their home should be placed together unless such placement would be contrary to the safety or well-being of any of the siblings”). They argued alternatively that good cause existed to depart from ICWA’s placement preferences.

Thus began a course of briefing in the trial court on ICWA’s constitutionality, with the Bs challenging its constitutionality and the Navajo Nation advocating its

8

constitutionality. The AG filed an amicus curiae brief in support of the Bs, challenging the constitutionality of ICWA on the same grounds and also urging placement of Y.J. with the Bs.

In January 2019, the Navajo Nation amended its placement request and instead moved to have Y.J. placed with Mother's great-aunt A.J.—a Navajo who lives on the reservation in Arizona near Y.J.'s four oldest half siblings,[7] who live with another great-aunt—and, alternatively, with the Colorado couple. The Navajo Nation also moved to dismiss the Bs' intervention for lack of standing. The trial court denied that motion.

In March 2019, the trial court issued a ruling on ICWA's applicability, making the following findings:

> The Court acknowledges multiple claims under the United States Constitution, but is providing deference to the United States Court of Appeals for the Fifth Circuit Stay Pending Appeal dated December 3, 2018, and conscientiously refraining from ruling on those matters in this order of the court.
>
> The Court finds . . . Texas Family Code §152.104(a) to be in violation of Article I, Section 1 of the Texas Constitution and inapplicable to the proceedings in this matter.
>
> The Court finds . . . Texas Family Code § 152.104(a) to be in violation of Article I, Section 3 of the Texas Constitution and inapplicable to the proceedings in this matter.

---

[7]Although Mother's rights to these half siblings have not been terminated, she does not see them.

The Court finds . . . Texas Family Code § 152.104(a) to be in violation of Article I, Section 3a of the Texas Constitution and inapplicable to the proceedings in this matter.

The Court finds . . . Texas Family Code § 152.104(a) to be in violation of Article I, Section 19 of the Texas Constitution and inapplicable to the proceedings in this matter.

The Court finds . . . Texas Family Code § 152.104(a) to be in violation of Article I, Section 29 of the Texas Constitution and inapplicable to the proceedings in this matter.

The court also held,

The Court, having reviewed the Motion to Declare ICWA Inapplicable as Unconstitutional, any responses and reply thereto, the evidence presented, the pleadings on file, the arguments of the parties, and the applicable law, is of the opinion that the Motion to Declare ICWA Inapplicable as Unconstitutional should be **GRANTED**.

**IT IS HEREBY ORDERED** that Texas Family Code 152.104, is unconstitutional and inapplicable to these proceedings.

Despite this ruling, neither the Bs nor the Department moved to strike the Navajo Nation's intervention.

Final trial was set for May 3, 2019. Although A.J. intervened before final trial, the trial court dismissed her intervention petition for lack of standing.[8]

A little less than a month before trial, Mother signed a voluntary affidavit of relinquishment of her parental rights; in it, she designated the Department as Y.J.'s

---

[8]A.J.'s petition in intervention stated "that placement with her would provide the child access to the four siblings and *the child's maternal grandmother*." [Emphasis added.] Because the evidence showed that in Navajo society older maternal relatives are referred to as grandmothers, it is unclear whether she was referring to herself or to Y.J.'s actual maternal grandmother.

managing conservator and stated that she preferred that Y.J. be placed with the Bs for adoption.

At trial, the Department, the Navajo Nation, and the Bs all supported termination of Y.J.'s parents' rights and appointment of the Department as Y.J.'s permanent managing conservator. The Department and the Navajo Nation recommended that Y.J. be placed with A.J.,[9] but the Bs advocated placing Y.J. with them and asked to be named possessory conservators so that the Department would not place Y.J. with A.J. after being named permanent managing conservator. The trial court ordered on the record that Mother's and all alleged fathers' rights be terminated, but instead of naming the Department Y.J.'s permanent managing conservator, the trial court named the Bs and A.J. joint managing conservators and designated the Bs as the primary persons to designate Y.J.'s residence, so long as Y.J. was living within

---

[9]The Department's recommendation was different than the AG's amicus recommendation. The record does not indicate why these two State agencies disagreed on the proper placement for Y.J., but the record does show that the Department had dealt with the Bs in connection with Alan's adoption and that Department workers were aware of the Bs when Y.J. came into care because of the federal court litigation. Y.J.'s caseworker could not explain why the Department never considered the Bs even for a temporary placement because other Department workers made that decision; she admitted the Department did not follow its own policy about placing removed children in care with siblings. Additionally, C.B. testified that he had asked Y.J.'s caseworker—also Alan's caseworker—on the date the Department removed Y.J. from Mother's care whether she knew anything about Y.J.'s being in care, and she told them she did not know and said, "[I]f there was a baby in care, I think I would know about it." The caseworker at first did not admit that she had talked to C.B., but when given the date of the phone call, she explained, "I believe at that time I didn't feel comfortable with giving him any information of that case" because she could not disclose a child's personal information to a nonparty.

11

two states of Arizona (including Texas). The trial court stated its intention to treat the Bs and A.J. as if they were divorced parents residing more than 100 miles apart, but with a stair-step schedule for A.J.'s possession, beginning with one week in summer 2019, two weeks in summer 2020, and so on until Y.J. turned five, when A.J. would have extended summer possession. The trial court dismissed the Department from the suit.[10]

After trial, the AG also intervened in the suit and filed a motion for new trial. The AG continued to support placement of Y.J. with the Bs.

The trial judge did not sign an order of termination until almost two months after trial. The order is consistent with the trial judge's ruling on the record and provides a detailed possession schedule, which until 2023 gives A.J. exclusive possession of Y.J. only during the stair-stepped weeks in the summer. Beginning in 2023, when Y.J. turns five, the order provides for possession by A.J. one weekend each month, one week every spring, and extended summer possession. The order provides that the Bs have the right of possession of Y.J. "at all other times not specifically designated" for A.J.

The only parties that appealed the trial court's judgment are the Bs, the AG, and the Navajo Nation. Because the Department did not file a notice of appeal, and no party has argued that just cause exists for rendering a judgment that the Department be named managing conservator, we do not consider that as a choice for

---

[10]The Department did not file a notice of appeal from the trial court's ruling.

our disposition. *See* Tex. R. App. P. 25.1(c); *see also* Tex. Fam. Code Ann. § 161.207(a) (requiring trial court to appoint "suitable, competent adult" as managing conservator after termination if not appointing the Department). Thus, the only dispute before this court is whether the trial court's awarding joint managing conservatorship to the Bs and A.J. should stand. The Navajo Nation asks us to reverse and render a judgment that Y.J. be placed in accordance with ICWA preferences (or in the alternative, to remand for ICWA-compliant proceedings); the Bs and the AG ask us to hold ICWA unconstitutional, reverse the trial court's order, and render judgment that the Bs be named Y.J.'s sole managing conservators so that they may adopt her. Because we determine that the trial court abused its discretion in making its joint-managing-conservatorship ruling, necessitating a remand for a new trial, regardless of whether ICWA applies, we do not reach the constitutionality of ICWA. But we do not foreclose the trial court's reconsidering the issue and ruling on it in the remanded proceedings.

## The Bs Have Standing In This Suit

In its fifth issue,[11] the Navajo Nation argues that the Bs lacked standing to seek placement of Y.J. with them or appointment as managing conservators. According to the Navajo Nation, Family Code Section 102.005(4), on which the Bs relied to intervene in the suit, allows a party to seek only adoption or termination and adoption, not placement or appointment as a managing conservator. The Navajo

---

[11]We address the issues out of order for ease of discussion.

Nation also argues that Section 102.005 allows a party to file only an original suit, not an intervention, because the statute does not specifically say that it allows intervention.

Section 102.005 provides that "[a]n original suit requesting only an adoption or for termination of the parent–child relationship joined with a petition for adoption may be filed by . . . an adult who has adopted, or is the foster parent of and has petitioned to adopt, a sibling of the child." Tex. Fam. Code Ann. § 102.005(4). The Navajo Nation does not dispute that the Bs have adopted Alan.

As a general rule, an individual's standing to intervene is commensurate with that individual's standing to file an original lawsuit. *In re A.C.*, Nos. 10-15-00192-CV, 10-15-00193-CV, 2015 WL 6437843, at *9 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.); *Whitworth v. Whitworth*, 222 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g) ("Generally, an intervenor must show standing to maintain an original suit in order to intervene."). A party's standing to file an original suit affecting the parent–child relationship is typically governed by Family Code Sections 102.003, 102.004, and 102.005. Tex. Fam. Code Ann. §§ 102.003–.005; *A.C.*, 2015 WL 6437843, at *9; *see In re Smith*, 262 S.W.3d 463, 467 (Tex. App.—Beaumont 2008, orig. proceeding [mand. denied]). A party who has standing to file an original suit under Section 102.005 may also file an intervention under that same statute. *A.C.*, 2015 WL 6437843, at *8–9.

14

The Navajo Nation acknowledges the holdings of *A.C.* and *Whitworth* but argues that by not specifically mentioning intervention, the plain language of Section 102.005 allows only the filing of an original suit, not an intervention. The Navajo Nation cites no authority supporting this proposition, and we have not found any. It discusses the holding in *Whitworth*—in which the court discussed Family Code Section 102.004(b), which specifies which parties can intervene in a suit affecting the parent–child relationship—but *Whitworth* does not support the Navajo Nation's argument. 222 S.W.3d at 621–22. Section 102.004(b) provides standing to intervene to certain parties who do not have standing under another Family Code provision to file an original suit. *See* Tex. Fam. Code Ann. § 102.004(b); *In re N.L.G.*, 238 S.W.3d 828, 830 (Tex. App.—Fort Worth 2007, no pet.); *In re A.M.*, 60 S.W.3d 166, 169 (Tex. App.—Houston [1st Dist.] 2001, no pet.). But the Bs do have standing to file an original suit under Section 102.005(4), and that section does not expressly prohibit a party with original standing from intervening in a suit. Nor does any other Family Code provision. *But cf.* Tex. Fam. Code Ann. § 102.006 (limiting standing of certain parties who would otherwise have standing to file an original suit affecting the parent–child relationship). Therefore, we conclude that the plain language of Section 102.005(4) permits the Bs to intervene rather than bars them from intervening.

The Navajo Nation argues, alternatively, that the Bs' standing was limited to seeking adoption only, or termination and adoption, and that the Bs have no standing to seek placement of Y.J. or managing conservatorship because Section 102.005 limits

the relief they can ask for. The Bs' focus in their pleadings and at trial was for the parents' rights to be terminated so that the Bs could adopt Y.J., which is what Section 102.005 gives them standing to seek. *See Turner v. Robinson*, 534 S.W.3d 115, 123 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("Standing is determined at the time suit is filed in the trial court."). Their requests for conservatorship were in response to the Department's apparent unwillingness to consider them as a placement and potential adoption choice. Additionally, because Y.J. had not been placed with them, she had not lived with them for at least six months—a prerequisite to adoption unless the trial court waives that requirement when it is in the child's best interest. *See* Tex. Fam. Code Ann. § 162.009. Absent the trial court's waiver, the only way the Bs could fulfill the residency prerequisite was by obtaining conservatorship and possession of Y.J.

Here, the trial court ordered termination but not adoption in a suit in which the Bs had standing to seek them jointly. Nothing in Section 102.005 limits their standing to seek post-termination conservatorship as against the Department or any other nonparent in this instance. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) (noting that because standing—in terms of a party's right to initiate a lawsuit and the trial court's power to hear it—is determined when suit is filed, subsequent events do not deprive the court of subject matter jurisdiction).

We therefore overrule the Navajo Nation's fifth issue.

**Constitutionality of ICWA and Family Code Section 152.104(a)**

In its first and second issues, the Navajo Nation contends that the trial judge erred by not holding ICWA constitutional and by holding that Section 152.104(a) of the Family Code violates the Texas constitution. The AG's first and second issues, and the Bs' first through third issues, urge the opposite contention: they argue that ICWA is unconstitutional, that Family Code Section 152.104(a) engrafts all of ICWA into Texas law, and that Section 152.104(a) violates the Texas constitution. Although we hold that the trial court made two errors in its legal reasoning, we do not sustain any of the parties' issues related to the constitutionality question because we need not decide their merits.

First, although the trial judge stated that he declined to decide ICWA's constitutionality under the United States Constitution, he determined that ICWA could not validly pre-empt Texas law because it violates the anticommandeering doctrine, as explained in *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018): "The anticommandeering doctrine . . . is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." In describing the doctrine, the Supreme Court explained that a statute that violates the anticommandeering doctrine *is unconstitutional* because no provision in the Constitution gives Congress the power to pass such a law. *Id.* at 1479. Although *Murphy* discussed whether a statute that violates the anticommandeering doctrine could validly pre-empt state law, the

Court determined that such a statute could not because pre-emption flows from the Supremacy Clause, which is not an independent grant of congressional power. *Id.* In other words, pre-emption under the Supremacy Clause will not save a statute that violates the anticommandeering doctrine because such a law still exceeds Congress's power under the United States Constitution, and otherwise unconstitutional statutes cannot pre-empt state law. *See id.* Thus, by determining that ICWA violates the anticommandeering doctrine under *Murphy* and cannot pre-empt Texas state law, the trial court actually determined that ICWA is unconstitutional under the United States Constitution, even though it purported not to do so.

Second, the trial court then held that Texas Family Code Section 152.104(a) purports to independently apply all provisions of ICWA to all aspects of a Texas child custody proceeding involving an Indian child. *See* 25 U.S.C.A. § 1903(4) (defining "Indian child"). Section 152.104(a) provides that "[a] child custody proceeding that pertains to an Indian child as defined in the Indian Child Welfare Act of 1978 (25 U.S.C. Section 1901 et seq.) is not subject *to this chapter* to the extent that it is governed by the Indian Child Welfare Act." Tex. Fam. Code Ann. § 152.104(a) (emphasis added). "[T]his chapter" is Chapter 152, which adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). *Id.* § 152.101. Chapter 152 deals generally with the proper court in which custody disputes regarding a child are to be heard and the authority to be given to child custody determinations of other courts. *See id.* §§ 152.001–.317.

By its plain language, Section 152.104(a) does not purport to apply all ICWA provisions to all facets of Texas child custody proceedings. By limiting its scope to "this chapter," it defers to ICWA only in jurisdictional issues arising under the UCCJEA.[12] No such issues occurred in this proceeding. Except for the Navajo Nation's attempt to remove the case to a tribal court—the denial of which the Navajo Nation has not appealed[13]—all parties have agreed that the trial court is the court of continuing, exclusive jurisdiction for this case. *See id.* § 152.202. Thus, the trial court erred by holding that Section 152.104(a) of the Family Code purported to make all of ICWA applicable to all facets of Texas child custody proceedings, independent of federal law. The placement preferences of ICWA at the heart of this case are not affected by whether Section 152.104(a) violates the Texas constitution; thus, that ruling of law was unnecessary to the disposition of this case.[14]

---

[12]By comparison, other states have specifically incorporated ICWA into state proceedings. *See, e.g.,* Cal. Welf. & Inst. §§ 224–224.6 (incorporating specific provisions of ICWA into California law); Okla. Stat. tit. 10, § 40.1 (stating that the Oklahoma Indian Child Welfare Act was intended to clarify "state policies and procedures regarding the implementation by the State of Oklahoma of the federal Indian Child Welfare Act"), § 40.6 ("The placement preferences specified in 25 U.S.C. Section 1915, shall apply to all . . . preadoptive, adoptive and foster care placements.").

[13]ICWA allows such a removal only if no parent objects. 25 U.S.C.A. § 1911(b).

[14]We therefore agree with the Navajo Nation that Section 152.104(a)'s constitutionality has no bearing on this case. Accordingly, we also decline to address whether Section 152.104(a) violates the Texas constitution. *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003).

To summarize, the trial court purported not to decide whether ICWA violates the federal Constitution, but its ruling that ICWA violates the anticommandeering doctrine is actually a determination that ICWA is unconstitutional. Although the trial court purported not to apply ICWA to the proceedings, it allowed the Navajo Nation to participate in the trial[15] and made A.J.—a nonparty whose interest is being represented only by the Navajo Nation—a joint managing conservator. And, as an alternative ruling, the trial court found that even if ICWA is constitutional and applied to the proceedings, good cause existed to deviate from its preferred placement scheme. *See* 25 U.S.C.A. § 1915(a)–(b) (providing placement preferences "in the absence of good cause to the contrary"). Thus, the trial court applied ICWA while purporting not to apply ICWA.

The trial judge understandably attempted to avoid squarely addressing whether ICWA violates the United States Constitution. A federal district judge has held that it does, a Fifth Circuit panel—with one judge dissenting—has held that it does not, and the Fifth Circuit court has vacated the panel opinion and judgment and will be rehearing the case en banc. Therefore, this exact issue has been—and will be—extensively briefed and argued in the federal system in a case in which both the State of Texas and the Bs are parties. But in his attempt to fashion a remedy that

---

[15]*See* 25 U.S.C.A. § 1911(c) (giving Indian child's tribe the right to intervene at any point in a state proceeding for the foster care placement of, or termination of parental rights to, an Indian child).

incorporates the important concerns of ICWA[16] and Texas law regarding the best interest of the child,[17] the trial judge made conflicting rulings in this case that are difficult to harmonize. In attempting to address the interests of all parties and provide alternative relief in the event the Fifth Circuit (or perhaps ultimately the United States Supreme Court) decides ICWA is constitutional,[18] the trial judge reversibly erred. Because, as we explain below, the trial judge's sua sponte conservatorship ruling necessitates a new trial regardless of the federal system's conclusion regarding ICWA's constitutionality, we need not reach the federal constitutional issue[19] and therefore do not grant any of the parties relief under their related issues.

---

[16] *See id.* § 1901–02.

[17] The Navajo Nation contends "that ICWA does not abandon—nor compel trial courts to abandon—the best interests of children. Instead, ICWA supplements the traditional best interest standards with a modified best interest standard and stated placement preferences, which are not absolute."

[18] Practically speaking, we do not quarrel with this approach. Failing to comply with certain provisions of ICWA can result in a challengeable, infirm judgment well after the trial court has made a ruling and the child has bonded with a caregiver, *see id.* § 1913(d) (allowing an Indian child's parent who voluntarily consented to adoption to petition to vacate it on duress or fraud grounds), §1914 (allowing Indian child's parent or tribe to petition to invalidate foster care placement or termination for violation of Sections 1911, 1912, 1913), a result which goes against bedrock principles underpinning Texas family law that are focused on promoting stability and permanence for children. Following the procedural requirements of ICWA for the termination—while recognizing the tension that can seemingly result in some cases between its stated goals and a child's best interest—is an understandable approach until the federal constitutional question is settled.

[19] Likewise, we need not address the Navajo Nation's subargument that the AG and the Bs are bound by issue preclusion, an argument which the Navajo Nation

**Evidence Does Not Support Ruling Under Either Texas Law or ICWA**

The Navajo Nation's fourth issue, and the Bs' fourth and fifth issues,[20] advocate that the trial court's joint managing conservatorship decision should be reversed: the Navajo Nation because it contends ICWA requires placement with A.J. only, in that the evidence is legally and factually insufficient to show that good cause exists to deviate from ICWA's Indian-centered placement preferences; and the Bs because (1) they contend that the trial court's decision is not in Y.J.'s best interest under Texas law[21] and (2) even if ICWA applies, the evidence shows that good cause exists to deviate from ICWA's placement preferences. Because both sides' complaints require an examination of the trial evidence, we review their issues together.

### Standard of review

The parties agree that we review the trial court's conservatorship decision for an abuse of discretion. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.K.M.*,

---

concedes has been rendered moot by the Fifth Circuit's subsequent actions in the case pending in that court, except to the extent that the complaint must be raised for preservation purposes.

[20]We do not reach the Navajo Nation's third issue, which argues about alleged error in pre-termination placement of Y.J. Because both parents' rights have been terminated and no party challenges the termination, even if error occurred in the pre-termination placements, the Navajo Nation would not be entitled to relief. *See In re A.M.*, 570 S.W.3d 860, 866–67 (Tex. App.—El Paso 2018, no pet.) (citing, and agreeing with reasoning of, Montana and Iowa cases holding similarly); *see also* Tex. R. App. P. 47.1.

[21]*See generally Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (setting forth nonexhaustive factors courts generally use in analyzing child's best interest).

No. 02-12-00469-CV, 2013 WL 6564267, at *2 (Tex. App.—Fort Worth Dec. 12, 2013, no pet.) (mem. op.). A trial court abuses its discretion if it makes an erroneous legal ruling even in an unsettled area of law. *See In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018) (orig. proceeding); *In re United Scaffolding, Inc.*, 301 S.W.3d 661, 663 (Tex. 2010) (orig. proceeding). Thus, whether the evidence supporting the decision is legally and factually sufficient is relevant in deciding whether the trial court abused its discretion. *See In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g).

### Evidentiary review

Termination of parental rights was not the focus of the trial because Mother relinquished her rights and a father could not be found; instead, the primary consideration before the trial court was where to place Y.J. after termination. The Bs' primary focus was on adoption, whether by immediate placement with them and eventual adoption after a conservatorship or by waiver of the six-month requirement and immediate adoption.

### The Department's caseworker

As stated before, the Department advocated placement of Y.J. solely with A.J. The caseworker testified that although delays in the Department's IT system had prevented the completion of an ICPC home study for A.J.,[22] she had no concerns

---

[22]The Department had sent the request to Arizona, who then had to send the request to the Navajo Nation. Once the Navajo Nation had completed its home study

23

about placement with A.J. after speaking with her on the phone. According to a representative from the Navajo Nation, the ICPC home study for A.J. would have been fully completed less than a week after trial. A.J. lives close to Y.J.'s four oldest half siblings and sees them at least once a week. A.J. had not visited Y.J. while the case was pending. When asked why, the caseworker responded, "Just financially and she's out of state. It's hard to come to Texas."

Y.J. was very bonded to the foster family she was living with at the time of trial, and the Department had no concerns about that home. The Department planned for Y.J. to stay there pending completion of A.J.'s home study. According to the caseworker, the Department would have recommended A.J. for placement even if ICWA did not apply because A.J. is a family member. According to the caseworker, Y.J.'s best interest was to be placed with A.J. instead of the Bs because of "family ties," which includes extended family. A.J. and Y.J.'s oldest half sibling had visited with Y.J. the day before trial.

The caseworker stated that the Bs had offered Mother an open adoption,[23] in which Mother would continue to have contact with Y.J. The Department did not think an open adoption was in Y.J.'s best interest. But the caseworker testified that it

_____

and other requirements, it would send the materials back to Arizona, which would then send the final approval to Texas. At the time of trial, Texas had sent the original request to Arizona, but Arizona had not yet forwarded it to the Navajo Nation.

[23]The caseworker was never asked to explain how she knew the Bs had offered an open adoption, but she said that she had become concerned because she had heard about a "possible" open adoption.

was in Y.J.'s best interest to stay in her then-current foster placement "for up to . . . two weeks" until the ICPC approval was finished, "knowing it can be finished with[in] less than a week." The Department intended to place Y.J. with A.J. upon Arizona's ICPC approval.

According to the caseworker, from September 2018 to the time of trial, the Bs had possession of and access to Y.J. for at least one visit per month, anywhere from overnight to a full day. Y.J.'s foster mother set up these visits. When asked whether the sibling contact between Y.J. and Alan would be maintained if Y.J. were to be placed with A.J., the caseworker responded, "I believe [Y.J.] will know where to contact her brother and how that initial -- initial bond that she created when she met him here."

Although the foster parent was adoption motivated, the foster family was not ICWA compliant.

**CASA representative**

Stacey Main, the CASA representative for Y.J., had also been Alan's advocate. Main recommended placing Y.J. with the Bs because of the relationship they already had with her and to minimize "trauma."[24] She also acknowledged that naming the Department as Y.J.'s managing conservator would facilitate financial subsidies for Y.J.

---

[24]Main said that CASA had trained her in trauma, utilizing a continuing series of two-hour lectures from a doctor who specializes in childhood trauma.

According to Main, Y.J. already had an attachment to her foster mother and to the Bs. But Main agreed it was important for Y.J. to bond with her oldest half siblings and extended family in Arizona. As to placement with A.J., Main opined, "I look at it as a win-win either way. If she goes with the [Bs], she wins. If she goes with [A.J.], she wins. If she stays with the foster home, she wins. I like them all." According to Main, keeping Y.J. "with family" was the main goal, and Y.J. would have contact with her family with any of those placements.

Y.J. had normal, sibling-type interactions with the Bs' children. Her then-current foster parents "adore[d]" her and were bonded to her.

**Navajo Nation expert**

Celeste Smith, a senior social worker with Navajo Children and Family Services Indian Child Welfare Act, testified as an expert on the Navajo Nation. Smith is an enrolled member of the tribe who lives on the reservation. Although Smith agreed that termination of the parents' rights was in Y.J.'s best interest, she recommended placement of Y.J. with A.J.

Smith had initiated a home study for A.J., but she had not received it by the time of trial because the ICPC request with Arizona had not been completed. Nevertheless, she had no concerns about A.J. based on background checks.[25] Smith estimated that when she received the ICPC request from Arizona, she could finish the

---

[25]State and federal background checks, and Navajo Department of Family Services background checks, for A.J. and her adult son living with her showed "no findings."

home study within a week. The only remaining items were for A.J. to obtain a Navajo Nation foster care license and for Smith to check two additional references. A.J. had already completed the foster care "trainings," and Y.J. could be fully placed with A.J. before A.J. was officially licensed as a foster parent.

Additionally, according to Smith, A.J.'s home was clean, safe, and appropriate for Y.J. A.J. lived with her adult son in a two-bedroom home with an addition in back for which a doorway needed to be cut. Y.J. would sleep in A.J.'s bedroom with her, which is not uncommon for Navajo. A.J. is a homemaker, which is a traditional Navajo role, and her children help support her and take care of her bills, which is also Navajo custom. A.J. receives food stamps and her monthly income varies. Her thirty-three-year-old son and other family members would provide Y.J.'s care when she could not, such as when she was helping care for her chronically ill mother and brother. According to A.J., Y.J. will take the bus to school when she gets older.

Smith testified that the references she contacted for A.J. acknowledge that she is a good candidate for placement. A.J.'s family, including the family living on the reservation, are "very close" and were supportive of A.J.'s decision to seek placement of Y.J. with her. Y.J.'s maternal grandmother, A.J.'s sister-in-law, communicates with A.J. and has contact with Mother. According to Smith, Y.J.'s maternal grandmother returns to the reservation "on and off."[26]

---

[26]This evidence renders somewhat curious the Department caseworker's concern that the Bs would seek an open adoption. Although the trial court could not

Smith further testified about the importance of the Navajo culture to Y.J.: "[I]t's her whole identity. It's going to help . . . to know where she comes from, what her clans are, what . . . Navajo culture traditions there are for her. From . . . birth . . . to [her] elderly age, she could have the ceremonies, the teachings, in order to . . . [have] a balance[d] life for her." Smith explained that children are sacred to the Navajo and that the tribe is always looking to its children's future. Smith explained that contact with Y.J.'s oldest half siblings, especially the oldest who understands the Navajo language and traditional Navajo foods and customs, would help Y.J.'s cultural understanding of what it means to be a Navajo girl and woman. It is especially important to hand down the Navajo language. The Navajo Nation's concerns about non-Navajo placement were the loss of cultural and institutional knowledge of the Navajo Nation and the difficulty for children living outside the reservation to participate in Navajo ceremonies because they generally are not open to the public. But Navajo children who do not live on the reservation may participate in traditional ceremonies with their family. Smith acknowledged that Y.J. would not receive benefits for being a tribal member but would receive free medical care.

---

have judicially noticed for its truth the Department's statement in the affidavit attached to its removal petition that Y.J.'s maternal grandmother had a CPS history in New Mexico, *see In re R.A.*, No. 02-18-00185-CV, 2018 WL 5832148, at *8 (Tex. App.—Fort Worth Nov. 8, 2018, no pet.) (mem. op.), it could have judicially noticed that the Department had made such an allegation. Nevertheless, it is undisputed that A.J. does not have contact with Mother.

According to Smith, in January 2019, when Mother found out that A.J. was also interested in placement, Mother told her that she would be satisfied with placement of Y.J. with either the Bs or A.J. But Smith did not find out about Mother's affidavit of relinquishment, in which she again expressed a preference for the Bs, until the day before trial.

**C.B.**

C.B. testified that the Bs had found out about Y.J.'s birth through Alan's biological paternal grandmother, who is a Cherokee. The Bs keep in touch with her and the adoptive mother of Mother's fifth and sixth children, who also have a Cherokee birth father.

C.B. testified that the Bs had not promised Mother an open adoption but had not closed the door to possible supervised visitation between Y.J. and Mother if Mother were to stay sober and was consistent with her promises. In other words, they were "open to being open." But C.B. also said that the Bs would comply with any court order that Mother have no contact with Y.J. Additionally, Mother had never requested visitation nor had any contact with Alan.

According to C.B., Alan "understands that [Y.J.'s] his sister" and is excited to see her. She "lights up" around him. All of the Bs' children are "very playful" with Y.J., and she likes the attention and interaction. The Bs "feel very strongly that [Y.J. and Alan] should grow up together and support and love each other" because of their important sibling bond. The Bs were concerned that if Y.J. were placed with A.J., she

might never see Alan again. Their plan was for Y.J. to sleep in a room with Alan until "it was age appropriate necessary" for her to have her own room.

Although the Bs met with Mother after they found her in the county jail, they did not ask her to request them for placement, nor did they discuss an open adoption. C.B. was not present when Mother signed the affidavit of relinquishment, and he did not ask her to sign it. He did not know where it was signed or created because "[a]ll of that was handled through her attorney."

The Bs were trying to learn Navajo culture. They had used age-appropriate books for that purpose, but because Alan was only three and a half at the time of trial, the books were more "lifestyle" books. To involve Alan in the Cherokee culture, they maintained a relationship with his biological family, particularly his biological paternal grandmother. They had "sought recommendations from her . . . [and] directions [they] could point him in." They had attended two public powwows in the Dallas/Fort Worth area and were educating themselves, as C.B. put it, to "better educate our child and our children, . . . as a family, what it means to be native, the history, the culture. . . . [A]s an outsider looking in, as best as we can, that is difficult[,] and we have always welcomed any resources that are there to help us in that process." C.B. acknowledged that because the Cherokee tribe has been more involved in Alan's life, he has a stronger connection to that tribe, but the Bs do not prefer one tribe over another. Alan's Navajo family had not attempted to contact him, but C.B. said the Bs

"would welcome any contact from [that] family to help" raise him. C.B. did not think that Alan's Navajo family's lack of contact with him would change, though.

When asked, "You understand the conundrum here, that we have more than just one sibling in this picture?" C.B. answered, "Yes." He acknowledged that "the problem of trying to prioritize which sibling is most important to have a relationship with moving forward" was "very complicated."

### J.B.

J.B. acknowledged that the Bs did not know much about Navajo culture. J.B. had tried to contact Y.J.'s maternal grandmother and had texted her pictures of Alan at Mother's request. J.B. testified that Y.J. had visited with the B family one day each month between September 2018 and January 2019 and once each month for a forty-eight-hour period between January 2019 and trial.

### Summary of the Bs' adoption report for Alan

The trial court admitted into evidence a favorable 2017 adoption report for the Bs that CK Family Services had completed for Alan's foster placement and adoption. The Department placed Alan with the Bs the day he was removed from Mother's care. At the time of the report, the Bs were in their late thirties; they have two biological children, who were both under the age of ten. C.B. was a college-educated stay-at-home father, and J.B. was an employed in the medical field with a substantial monthly income. The interviewer described their marriage as "stable and loving," their family as "loving and affectionate," and their characters as "compassionate." The

home environment was safe; they lived in a four-bedroom, three-bath home with their children and a dog. Both Bs had passed criminal and child abuse background checks.

Regarding Alan's biological family, the report stated that the Bs had maintained phone contact with his paternal grandmother and that they were "open to . . . have contact, as long as it is appropriate," with biological family members to ensure he has a "familial and cultural connection." Additionally, it stated the Bs "want[ed] to ensure they learn and implement [Alan's] culture into their home and lives due to [his] being Navajo and Cherokee Indian." At the time, Alan had never met any of his oldest half siblings.

CK Family Services updated the report in October 2018 after the Bs became interested in adopting Y.J. The addendum was not as detailed as the original report but showed no significant changes.

**A.J.**

A.J. testified that she lives on the Navajo reservation close to many family members. Y.J.'s four oldest half siblings live with A.J.'s older sister about twenty-seven miles from her. A.J. sees Y.J.'s oldest half siblings twice a week, but Y.J. would see them probably every other day. A.J. has a lot of extended family members who would help with Y.J.'s care and take care of anything she could not.

A.J. said she would follow any order that Y.J. have no contact with Mother; A.J. had not heard from Mother for many years.

A.J. supplements her income by making and selling crafts, and her four sons and her daughter help her financially, which is normal for Navajo families on the reservation. A.J. testified that she would be able to support Y.J. financially.

A.J. did not know much about Alan, but Y.J.'s maternal grandmother had told her "a little bit." She did not know about Y.J.'s other children in the DFW area. When asked, "When you were asked about coming out here to visit [Y.J.], has cost been a consideration -- has cost been a problem for you to be able to come out here to visit *up until now*?," she answered "No." [Emphasis added.]

**Findings**

The trial judge made extensive findings on the record and in written findings of fact and conclusions of law.

On the record, the trial judge stated that he had applied the *Holley* factors in deciding who should be Y.J.'s managing conservator. He ordered that Y.J. be enrolled in a Navajo language class, which the Navajo Nation had a duty to identify, beginning as soon as possible and continuing until she turned fourteen. The judge acknowledged that "[w]hen a person leaves a [n]ation, there is an expectation that you will lose some of your culture. . . . [A]nd there's expectation your [descendants] will also slowly lose some of their culture but that's part of the decision that we make to immigrate to other cultures and other countries." He recognized that Y.J.'s Navajo culture is part of her identity and that preserving culture and heritage can be a struggle. He stated that "[t]he goals of ICWA are noble and most often what is best for the children." As for

33

the dual joint managing conservatorship, he explained, "I'm trying to find that mix to ensure that we give this child every chance possible to maintain ties with . . . her rich Navajo history and culture, in the meantime, doing what I feel like is best for the child at this point." The judge indicated that "a large factor in this [ruling] was the relationship that she would have with her biological brother who is the closest sibling in age to her."

Acknowledging the evidence about the importance of tribal rituals that occur when a child reaches certain milestones, the trial court said that there is no way to plan those and he "certainly wish[ed] there was a way for the Court to plan other things out to make sure she's in touch with her heritage and not lose sight of that." But the judge went on to say that—without regard to any of the parties' financial resources—he thought it was in Y.J.'s best interest to live with her half sibling who was closest to her in age while maintaining her cultural ties to the Navajo Nation. He stated, "[T]here was no bad situation for [Y.J]."

The trial court signed findings of fact and conclusions of law consistent with its verbal findings. Specifically, the trial court found and concluded that "it is in the child's best interest to enter into this joint managing conservatorship arrangement to place her in a loving home with her half sibling who is closest to her in age by several years, while still ensuring the child's continued connection to Navajo culture and family." The trial court also found and concluded that the Bs would provide Y.J. "with a stable and loving home environment that gives her the care, nurturance,

guidance, and supervision necessary for [her] safety and development" and that it was in Y.J.'s best interest "to have her primary residence in the same home with her sibling, [Alan], who lives with [them] as their adopted son." The trial court further found that it was in Y.J.'s best interest for A.J. to have "the right of possession . . . for designated summer, weekend, and holiday periods." Finally, the trial court concluded that "the best interest of [Y.J.] provides good cause to place [her] with the [Bs] pursuant to 25 U.S.C. § 1915(b)."

**Best-interest determination without consideration of ICWA**

The Bs contend that the trial court abused its discretion under Texas law, without regard to ICWA's placement preferences, by naming A.J. a joint managing conservator and mandating a possession and access schedule akin to parents living more than one hundred miles apart. Their argument discusses the *Holley* factors and places great emphasis on Y.J.'s sibling relationship with Alan.

The nonexhaustive *Holley* factors include

(A)    the [child's] desires . . . ;

(B)    the [child's] emotional and physical needs[,] . . . now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the

[child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by

the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing

parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions . . . .

544 S.W.2d at 371–72 (citations omitted).[27] We need not consider (H) and (I) because

whether Y.J. should be returned to her parents is not an issue.

Y.J. was too young to articulate her desires, and the evidence showed that she

had a normal, healthy infant's response to caregivers and other children. We need not

compare the degree of bonding with Y.J.[28] as between the Bs and A.J. because the

evidence showed that Y.J.'s primary bond at the time of trial was with her foster

mother, who had the primary care of and access to Y.J. by virtue of the foster care

placement. There was no evidence that she had any special emotional or physical

---

[27]We employ the *Holley* factors in reviewing conservatorship orders, in addition to termination orders. *See In re R.M.*, No. 02-18-00004-CV, 2018 WL 2293285, at *5 (Tex. App.—Fort Worth May 21, 2018, no pet.) (mem. op.).

[28]If ICWA applies, federal rules implementing it provide that "[a] placement may not depart from the preferences based solely on ordinary bonding or attachment that flowed from time spent in a non-preferred placement that was made in violation of ICWA." 25 C.F.R. § 23.132(e) (2016).

needs that could not be met by either the Bs or A.J. separately, nor was there any evidence of a particular emotional or physical danger to her other than theoretical contact with Mother. Both the Bs and A.J. expressed a willingness to protect Y.J. from harmful contact with Mother.

The evidence showed that both the Bs were excellent parents. There was not much evidence specific to A.J.'s parenting abilities, but the evidence showed that she had her own adult children who helped support her and that she maintained close ties to her family and extended family. There was not much evidence about any programs available to assist the Bs and A.J. other than that Y.J. would be entitled to health care on the reservation and would have access to Arizona Medicaid. She would also have access to an early intervention program and Head Start. The evidence showed that Navajo culture includes assisting older tribal members with their needs, and A.J.'s family would help her with child care. There was also evidence that naming the Department as managing conservator would have facilitated "financial subsidies" for Y.J.

The Bs wanted to adopt Y.J. She would be raised in a home with continual daily access to the half sibling that is closest to her in age, in a loving home with two other children. The Bs intended to facilitate contact with her two half siblings in the DFW area and expressed a willingness to provide contact with her other half siblings and family on the reservation and to educate her in Navajo culture. The Navajo Nation asked only for placement of Y.J. with A.J.; there was no evidence that A.J. had

any plans to adopt Y.J. if the child were to be placed with her. But Y.J. would be immersed in her Navajo culture and heritage, have weekly visits with four of her oldest half siblings, and have close contact with her extended Navajo family.

The evidence showed that both homes, individually, would be stable choices for Y.J., and each would fulfill a different primary need: with the Bs, a home with daily contact with her half sibling closest in age, the opportunity to see other half siblings living close by (and possibly her half siblings living on the reservation), and occasional interaction with the Navajo tribe directed by non-Indian parents; and with A.J., a home without daily sibling interaction but with frequent contact with her four oldest siblings and extended family and with immersion in Y.J.'s Navajo culture and heritage (but with possibly little to no contact with her half siblings in Texas).

Considering the *Holley* factors separately, then, without considering the sibling-attachment and contact evidence, the evidence is favorable for either the Bs or A.J. to provide a home for Y.J. But we are reviewing the trial court's decision to name all three nonparent joint managing conservators. No evidence supports the trial court's decision that Y.J.'s stability and permanence would be best served by the arrangement ordered. As the Bs note, the standard possession and access provisions generally exist for when parents—with whom the child already has an existing relationship—divorce or are not married and the trial court must order custody in a way that maintains an already existing bond between the child and those two parents. That is not the case here. And the arrangement seriously undermines the possibility that Y.J. could ever be

adopted. *See* Tex. Fam. Code Ann. § 162.009 (six-month residency requirement),[29] § 162.010 (requiring written consent to adoption by "a managing conservator" unless "the managing conservator" is a petitioner, but not specifically addressing consent required when a child has more than one—nonaligned—joint managing conservator), § 263.3026 (including as only permanency goal after termination by Department, "adoption of the child by a relative or other suitable individual"). Thus, here, the joint managing conservator arrangement does little to promote a stable and permanent solution for Y.J.

Based on the trial judge's comments, it is clear that he was trying to place Y.J. where she would develop and enjoy a daily sibling attachment, have the most access to all of her half siblings, and still maintain her relationship with and access to her Navajo culture and extended family.[30] But in doing so, the trial judge fashioned a remedy that seriously undermines Y.J.'s stability and permanence, particularly in her younger years.[31] Not only is establishing a stable, permanent home for a child a compelling state interest, the need for permanence is a paramount consideration for a

---

[29]A.J. could not meet this requirement under the current order.

[30]We also have no quarrel with the trial judge's suggestion that this could be a proper best-interest consideration under Texas law, regardless of ICWA's application, especially considering that the record includes expert testimony about the benefit to Y.J. of being a part of her heritage and culture.

[31]For example, without stating why it would be in her best interest, the order provides that when Y.J. turns five, she may fly alone between the airport nearest the Bs' residence and the airport nearest A.J.'s residence.

child's present and future physical and emotional needs. *In re J.W.*, No. 10-18-00344-CV, 2019 WL 5078678, at \*8 (Tex. App.—Waco Oct. 9, 2019, no pet. h.) (mem. op. on reh'g); *see* Tex. Fam. Code Ann. § 153.001(a)(2); *In re A.B.*, 412 S.W.3d 588, 609 n.15 (Tex. App.—Fort Worth 2013) (en banc op. on reh'g), *aff'd*, 437 S.W.3d 498 (Tex. 2014). Accordingly, we hold—without reference to ICWA—that the trial court abused its discretion by naming the Bs and A.J. the child's joint managing conservators with a possession and access schedule akin to parents living more than 100 miles apart.

We sustain the Bs' fifth issue.

**Good cause under ICWA**

The trial court likewise abused its discretion in making its alternative good cause finding under ICWA because the evidence is factually insufficient to support it.

A party seeking to establish good cause for not following ICWA's placement preferences for adoptive or preadoptive placement—here, with a member of the Indian child's extended family—must bring forth clear and convincing evidence of good cause. *See* 25 C.F.R. § 23.132(b) (2016).[32] That good cause must be based on at

---

[32]This standard is set forth in the Bureau of Indian Affairs' Final Rule, which clarifies the "minimum Federal standards governing implementation of . . . ICWA to ensure that ICWA is applied in all States consistent with the Act's express language, Congress's intent in enacting the statute, and to promote the stability and security of Indian tribes and families." *Id.* § 23.101 (2016). The Bs do not raise independent constitutional challenges to ICWA and the current version of the Final Rule. Thus, in assuming ICWA's application for purposes of this part of our analysis, we also presume—without deciding—the constitutionality of the Final Rule.

least one of several considerations; here, the two possible considerations are "[t]he request of one or both of the Indian child's parents, if they attest that they have reviewed the placement options, if any, that comply with the order of preference" and "[t]he presence of a sibling attachment that can be maintained only through a particular placement." *Id.* § 23.132(c)(1), (3).

To determine if evidence is legally sufficient under the clear-and-convincing standard, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Evidence is factually insufficient under the clear-and-convincing standard if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the finding is true. *Id.*

### Mother's placement preference

In Mother's first affidavit stating her preference that Y.J. be placed with the Bs, she averred that she had reviewed the potential placement with the Colorado couple and preferred the Bs so that Y.J. would be "placed with[] her brother and his adoptive family rather than with strangers who live several hundred miles away." A.J. had not been identified as a potential placement at that time. Although this evidence is legally sufficient to meet the clear-and-convincing standard, Mother's affidavit of voluntary relinquishment—which also stated her preference for Y.J.'s placement with the Bs but

41

which she signed after A.J. had been identified as a potential placement—did not state that Mother had reviewed A.J. as a potential placement. And Smith testified that Mother had indicated at one time that she preferred placement with either the Bs or A.J. Thus, the evidence is factually insufficient under the clear-and-convincing standard to support the trial court's finding of good cause based on a parent's preference.

### Sibling attachment maintainable only with a particular placement

Y.J. has seven half siblings: Alan who lives with the Bs, the four oldest who live in Arizona on the reservation, and two who live close to the Bs in the DFW area. The trial court was clearly concerned with how best to foster all of those sibling attachments and was faced with an incredibly difficult decision as to how to prioritize the importance of each of those attachments to Y.J.

The evidence showed that Y.J. was the closest in age to Alan, that she had visited with him, and that Alan had formed an attachment to her. Although Y.J. was by all accounts a happy infant with no discernable attachment problems—and therefore could be expected to "light[] up" when around other small children such as Alan—the evidence of Alan's attachment to her shows a benefit of that relationship *to Y.J.*[33] as she ages. She would also be living in a home with, and have daily interaction

---

[33]The Navajo Nation attempts to minimize this evidence, arguing that preservation of sibling attachments should be a guiding concern only when two siblings had been living together before being removed from a home. We do not

42

with, two nonbiological older siblings. The evidence also shows that the Bs have cultivated contact with Y.J.'s other two half siblings that do not live in Arizona and desire to continue that contact. C.B. testified that the Navajo family had not attempted to contact Alan and that he did not think Y.J. would have much contact with Alan if she were to be placed with A.J. Although A.J. testified that it had been no problem to come to Texas up until the time of trial, she had only attended trial and visited with Y.J. once. There was no evidence she or the family could afford to maintain cross-country visits with Alan or her other two DFW-area siblings. And Y.J. would not be living in a home with any of her half siblings in Arizona.

But the evidence also showed that A.J. and Y.J.'s oldest half sibling had visited with her once before trial and that her close Navajo family was excited at the prospect of having Y.J. live with A.J. Although the trial court found that the Bs could best maintain the sibling relationships, it ordered A.J. to pay the cost of Y.J.'s travel to Arizona after the age of five and to accompany her on all flights during summer 2022.[34] The evidence also showed that even though the oldest half siblings lived about half an hour from A.J., she saw them frequently and anticipated that Y.J. would see them every other day. This is in keeping with Smith's testimony about the importance

---

agree that the trial court's consideration of the importance of sibling relationships to a child when making a best-interest determination is so limited.

[34]This provision appears to conflict with another provision in the order requiring the Bs to deliver Y.J. to A.J.'s residence, and for A.J. to surrender Y.J. at her residence, for the "four continuous week[]" summer 2022 possession.

of family in Navajo culture. Finally, the evidence showed that the Bs wanted to maintain a relationship between Alan and Y.J. and likely have the financial means to travel to facilitate visits. Thus, there is conflicting evidence of a sibling attachment that could be maintained only through a particular placement.

We hold that the evidence regarding sibling attachment conflicts such that the trial court's finding that good cause existed to deviate from Section 1915's placement preferences is factually insufficient.[35] Because the evidence is factually insufficient to support the trial court's good cause finding under either of the possible considerations set forth in the Final Rule, we conclude that the trial court abused its discretion in making that finding. We thus sustain the Navajo Nation's fourth issue and overrule the Bs' fourth issue.

## Conclusion

Having sustained the Navajo Nation's fourth issue and the Bs' fifth issue, we reverse only the part of the trial court's June 28, 2019 order appointing the Bs and A.J. joint managing conservators of Y.J., and we remand the case for a new decision on conservatorship, or adoption, as the case may be. Although we limit remand to the conservatorship/adoption decision, we do not limit the trial court's reconsideration of previously raised legal issues that we have not ruled on, such as ICWA's

---

[35]Because we determined that the evidence supporting parental consent is legally sufficient, we need not address the legal sufficiency of the sibling-attachment factor.

constitutionality, or the trial court's consideration of new issues or evidence raised regarding conservatorship.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  December 19, 2019